Good afternoon. My name is Vicky Lai. With me is Jay Stansel and we represent Ronnie Mason. I'd like to reserve two to three minutes for rebuttal. There are two central issues in this case. One, whether Mr. Mason was seized. And two, whether that seizure was supported by reasonable suspicion. What informed the district court's decision on both issues was his determination that the arresting officer in this case either knew or believed that there had been a burglary. Counsel, if we concede a seizure, didn't your client consent to the search? Yes, that's what the record indicates, that he consented. What's wrong with that? Why should we reverse? Because our position is that there was no seizure. Okay. He's certainly been stopped for a prolonged period of time. He wasn't released. Police cars in the neighborhood surrounding him. Right. Do you think he had the freedom to take a walk? No, I don't. Then what's a seizure? Excuse me? Isn't that a seizure? Yes. Maybe I misunderstood your question, but we're not conceding that there is a seizure. I'd like to get into the context. No, you're not conceding. You're doing the opposite. You're saying there is a seizure. There is a seizure, yes. He would be, if he conceded it was a seizure, of course you're not. No, no, we are saying that there is a seizure. And I'd like to get into the context before the seizure. But a seizure isn't just because someone's not free to leave. Well, that's not the only thing that we have to look at, though, right? Well, the test is a free-to-leave test. Well, but there's other factors that we have to look at. You know, how many officers, you know, what? No, those factors go to whether a person would feel free to leave. But the test ultimately is whether a reasonable person would feel free to leave. If you concede that there was a seizure, did he not consent to the search? If there was a seizure, the consent to the search is a product of the legal seizure. Was the consent tainted by an unlawful seizure? Yes. Yes. The consent was tainted by an unlawful seizure. Okay. But I'd like to get back to the circumstances prior to the seizure. What informed the district court's decision was that the arresting officer knew or believed that there had been a burglary. What the district court failed to appreciate is that that belief was based entirely on radio transmissions from another officer. The Supreme Court has said in United States v. Hensley that where an arresting officer, an officer stops a person based on radio transmissions or dispatches from another officer, even if that officer objectively and reasonably relies on that information, there is still a Fourth Amendment violation where the officer who issues the bulletin has no reasonable suspicion. That requires us to look at whether the instigating officer of the radio dispatches had a reasonable suspicion to believe that there was a crime and that Mr. Mason was a suspect in that crime. Okay. It's not contested there was a 911 call, right? It's not contested, no. Okay. But that call reported only that there might be a burglary in progress. The reporting citizen saw only what he thought to be bolt cutters, two or three men. There are no descriptions of the men whatsoever. There was some description of someone might be a lookout and there was some description of a person standing at a station that might be involved that matched the description of your client, right? No. The reporting citizen didn't give any physical descriptions of the men. All he said was that he saw two men on the north side of the building. Okay. So the cops go there. The police go there. Right. Because they got a 911 call. They got a 911 call to do an area check. When they get there, they've been told there's a burglary. When they get there, they question the guy who's sort of running away. Right. They get there and the only thing that they find is they don't find any signs of the burglary. So the marginal information given by the citizen becomes more and more degraded the more they learn. All they find is the shady character who immediately runs. Right. But he says, there were two guys who asked me for money. Right. They obviously shook him up a little. He describes them. So now the police have been told there's a burglary. They've been told by the guy who runs a description of a couple of people involved. And then they see Mr. Mason. And he fits at least the description given not by the 911 caller, but by the shady character in your terms. Right. Who was fleeing when they got there. Well, you know, if they just want to stop your client to question him like a Terry stop. Yes. Why aren't they allowed to do that? That doesn't require a probable cause. No, it doesn't. It requires reasonable suspicion. Right. And let's look at the facts that would support reasonable suspicion. None are in this case. I mean, you need specific, articulable. You're approaching this like you're saying that officers have to know when they get there. They have to have all their investigation. No, no, I'm not saying that at all. But we have to look at what a reasonably trained officer would do. I know, but if a police officer got a 911 call, they get out there, and a guy tells them he's running from the scene, and the guy gives the description of someone that a couple people just shook him down, and that they're wearing an orange sweatshirt under a blue jacket with facial hair. Well, first I'd like to correct you. He didn't say that there was an orange sweatshirt. But you're saying that the officer should just turn around because saying, well, gosh. I mean, if that officer left at that point, we'd never solve any crimes. Again, let's go back to the facts. Okay, let's go back to the facts. We have a 911 call. The caller reported very little information. It was a hunch. He heard a bang. He thought he saw a gate open. He saw two or three men, potentially with bolt cutters. The officers get on the scene. They're doing an area check. They see nothing indicating that there was a burglary. The only thing that they find is. . . By the way, I thought, am I right that the officer who questioned Mr. Mason wasn't the one who walked around the perimeter of the shop. No, but. . . So the guy who questioned Mr. Mason, like in his head, he still had reason to think there might have been a burglary. Right, but as the United States v. Hensley case says, even if we assume the arresting officer reasonably relied on the dispatches by the instigating officer, the instigating officer who issued those bulletins still has to have reasonable suspicion. Otherwise, there's a violation of the Fourth Amendment. So if I can just continue and go to what the instigating officer had. In this case, the instigating officer was a rookie officer who had only been on the force for seven months. He was still on probation. When he gets to the scene, he finds Shady Carrick, who immediately runs. He's caught, handcuffed, Mirandized, and arrested. He's asked, what are you doing here? He can't come up with any story that sticks. Finally, he comes up with one that doesn't really even state a crime. He says, two men came up to me, asked me for money. I got scared. I ran. Now, we don't expect that the officers are going to just leave after that point, no. But what the officers did was that they did go around the perimeter. They investigated. So we have fairness of facts. Did that Shady Carrick give a description of someone? Let's have all the facts. Okay. Don't select the facts. Right. What did the Shady Carrick say? Okay. One, Shady Carrick is untrustworthy. No, no, no. Two, his facts were two black men. One had facial hair, goatee. They were wearing heavy jackets. We have to remember it was a winter evening. One was wearing a red or orange coat. I think he said jacket was his precise words. One jacket was bright red or bright orange. Right. Okay. Okay. The officer, the rookie officer who had Shady Carrick, who was in charge of the investigation, testified that he remained in the car with Shady Carrick pretty much the whole time. That person has a name. Maybe we should use the person's name. Okay, Mr. Vasquez. He remained with Mr. Vasquez in the patrol car the entire time. The citizen had come back on the scene. The citizen had actually submitted a written statement that said the three men had walked in front of his car. On direct, the instigating officer, the rookie officer in charge, was asked, did you talk to the citizen about what he might have seen? And he said, no, I really didn't. Well, not enough to get anything from him about what went on. I was in the car most of the time. Did you go around the perimeter? No. His training officer went around the perimeter. The training officer testified that he, in normal circumstances, would have radioed that, that he saw no signs of a burglary, but he, for some reason, didn't in this case. Okay. So the person you're calling, the rookie officer. Yes. He still has in his head that there's a 911 call that says there was a burglary. He still has in his head, but he also said there was no signs of a burglary. He didn't see that there was any glass. This is a commercial building. There was no alarms that went off. He said, so maybe we did have a burglary. Is this Officer O'Brien that you're talking about? No, this is the rookie officer, Officer Bennett. Maybe, I think, instead of calling people shady person, I think people probably prefer. Well, Officer Bennett. All right. The question is, would some, so under Hensley, the court said that if the instigating officer, the one who issues the bulletin, doesn't have reasonable suspicion, then the person who stops does not have reasonable suspicion. The instigating officer. I thought he's issuing the bulletin just based on the 911 call. No, he said he was issuing the, the bulletin that came from the 911 call, but that was just from dispatch. That was just saying do an area check. He is, is broadcasting, the dispatch is describing what Mr. Vasquez is telling him as soon as he's telling him that information. So he's not going around asking the other officers, what are you finding? He's not going to the citizen asking the citizen, who did you see? Can you give me more of a description? We don't have the build. We don't have the weight. We don't have. They're on the scene of the alleged. But there's no signs of a burglary. I mean. But all they did with Mr. Mason was to stop him to ask questions. Then the nature of his responses led the policeman to ask for more, which seems like standard. The nature of his responses are not what led to the, to further questions. It part by moving his hand towards his pocket. But the officer never testified. That's why he continued to ask him questions. When he was asked, why did you continue to detain Mr. Mason? Even though he had truthfully identified himself, he had cleared at least one criminal history check. Why did you continue to detain him? The officer testified that it was because I suspected him of being one of the burglary suspects. What was your client wearing? What was that testimony on that? What was your client wearing? He was wearing a blue coat. He was wearing sweatpants. Underneath the blue coat, he was wearing an orange sweatshirt. Okay. You've got one minute, 30-something seconds. Okay. So I would like to. Okay. Mr. Cornell, give us the government's position. May it please the Court. I'm Adam Cornell, and I represent the United States in this matter. I'd like to begin by addressing the Court's initial inquiry of counsel with respect to the issue of consent. This Court's decision in INS v. O'Harenge informs the Court with respect to the factors the Court should consider in determining whether the encounter between Mr. Mason and Everett police officer Kevin O'Brien was consensual. There are four of those five factors that meet the test, that meet that test in this particular case. As the Court knows, the five factors the Court is to consider are the number of officers, whether weapons were displayed, whether the encounter occurred in a public or a private place, and whether the demeanor of the officers, and finally, whether the suspect was notified of his right to terminate the encounter. This encounter between Officer O'Brien and Mr. Mason lasted no more than five minutes. It occurred in a well-lit public gas station at approximately 915 in the evening next to a busy five-lane street in Everett, Washington. As the Court knows, the standard of review in this matter is de novo, and that whether a seizure occurs is to be reviewed by that standard, but that the underlying factual inquiry is to be reviewed for clear error. The district court's findings were not clearly erroneous, and that this Court should affirm the lower court's ruling and find that, indeed, the encounter between Mr. Mason and Officer O'Brien was consensual in nature. The Court did not reach the issue of whether reasonable suspicion existed to stop and briefly detain Mr. Mason, and as this Court well knows, the Court may affirm the denial of a district court's motion to suppress on any basis that is fairly supported by the record. However, the fact, the specific facts on the record of the lower court, support this Court's finding of consent. This Court, this case is very similar to this Court's decision in the matter of the United States versus Orman, where there was the presence of two police officers, one of whom was approximately 20 feet behind the primary officer. This contact in the United States versus Orman occurred in a public shopping mall. There was a report that Mr. Orman had a weapon. Actually, I remember this case. Yes, I was the author. So to continue with the facts, Your Honor, as you're well aware, Mr. Orman was approached and asked if he might step aside. He was then asked if he had a weapon. He acknowledged that he did have a weapon. He was then asked by the officer if he would step into a private area, which he agreed to do. The Court, that case is very similar to this case insofar as, and this is the lower court's findings, Mr. Mason was approached by Officer O'Brien in a nonthreatening manner. He spoke to him in a social and moderate tone. He never displayed his weapon. In fact, the lower court found that Officer O'Brien never even put his hand on his weapon. The lower court also found in this matter that the officer never demanded that Mr. Mason answer any questions. In fact, the only prong of this Court's decision in INS v. O'Harangi that is not met is the fact that Officer O'Brien did not tell Mr. Mason that he had a right to terminate the encounter. And the Court's decision in the United States v. Drayton, as well as other Ninth Circuit cases, have found that the right to refuse consent or the right to terminate the encounter is not the sine qua non of consent. And this is the case in the matter before you now. In fact, throughout the contact, again, brief contact between Mr. Mason and Officer O'Brien, Mr. Mason continued to casually count change on top of a newspaper box. He didn't, the record at the lower court will reflect that Mr. Mason didn't act in any way that indicated that the officer was compelling his compliance. Going back to the United States. We have to assess whether a reasonable person in Mr. Mason's shoes would have felt free to leave. Your Honor, the test is whether a reasonable person would have felt otherwise free to terminate the encounter and go about its business. That is an objective standard. Do you think this defendant is a reasonable person who's a person who's been in prison and responded to the direction of custodial officers for a period of time, and he darn well better get locked up for solitary? Do you think he's the reasonable person on the street? Your Honor, I believe that the reasonable person standard applies to the encounter between Officer O'Brien and Mr. Mason, and that given the facts and circumstances found by the lower court, that Mr. Mason was otherwise free to terminate the encounter and go about his business. The subjective intent of the officer, as this court knows, is only relevant insofar as that subjective intent is conveyed to the person being confronted. In this case, there's nothing within the record of the lower court which suggests any feeling or concern that Mr. Mason had. Mr. Mason, as the court knows, did not testify before the lower court. And so what we have is the record of the testimony of Officer O'Brien, which I should mention the lower court found to be truthful, and the credibility findings of the lower court are given special deference by this court. What do we make of the, since it wasn't contested and that the officer testified subsequently, that Mr. Mason consented to having the pat-down search and that's when I guess the weapon was found in the cell phone case or something along those lines. Does that have any meaning in this equation, or is it all over by that point in time? Your Honor, it does have meaning, and as the court knows, the lower court found that the pat-down of Mr. Mason proceeded on either a voluntariness or a reasonable suspicion. With respect to Mr. Mason's voluntary consent to being patted down, the court's guided by five factors that are articulated in the matter of the United States v. Cormier and other cases. That is, whether the defendant was in custody, whether officers displayed weapons, whether he was provided his Miranda warnings, whether he was given his right to refuse consent, and finally whether the officers told him that they could obtain a search warrant. The final factor militates against voluntariness. In this case, the lower court found that Mr. Mason was not in custody. He was not read his Miranda rights. He was not notified by the officer that he had a right to refuse consent. So he only got one there. He only got one. That's correct. And, of course, again, the right to refuse consent is a factor, but the court is to consider all the factors and the totality of the circumstances in determining voluntariness. And I believe that the standard of review with respect to voluntariness is, was the lower court's findings clearly erroneous? And in this case, the lower court's findings were not clearly erroneous, and this court should find that Mr. Mason's consent to being patted down was voluntary. Well, assuming for you the worst-case scenario, hypothetically, if we were to find that it was a seizure and that he didn't consent to the pat-down, what were the facts, using the proper names of people, what were the facts that the officer had at the time that he did the pat-down search for the weapon? Okay. Should, in your, I believe, Your Honor, you're addressing the issue of was there reasonable articulable suspicion that Mr. Mason had committed a burglary? Yes. Or for the officer to pat him down. At 9.13 p.m., a 911 caller who was identified as David and provided a phone number said that there were three males who had possibly, possibly been involved in a burglary. One of those males was possibly a lookout at a Chevron station, which was across the street from the location of the reported burglary at a store called Performance Radiator. The Everett Police responded to that. Everett Police Officer Daniel Rebellos responded within two to three minutes and found a man named Rudy Vasquez, who was at the site of the reported burglary. Mr. Vasquez disappeared. He fled. He was later interviewed by, soon after, interviewed by Officer Bennett of the Everett Police Department, and Officer Bennett testified that Mr. Vasquez gave a number of different stories, and in the record, Officer Bennett testified specifically that based on his contact with Mr. Vasquez, he didn't know what he had. However, Mr. Vasquez said he identified two individuals, one of whom had a goatee or facial hair, and essentially said, and if I may refer directly to the record, the report was two black males, one with facial hair, goatee, both wearing heavy jackets. There was a later description that the individual or one of the individuals had a bright red or orange jacket. Officers responded to that call, and at the time that that report went out over the radio, Officer O'Brien, Officer O'Brien is the officer who confronted or encountered Mr. Mason. Officer O'Brien saw at the 76 station an individual, Mr. Mason, who was African American, who had facial hair, who was wearing an orange sweatshirt. Now, Officer O'Brien testified at the suppression hearing that he didn't have an independent recollection of what Mr. Mason was wearing, but that's not the same as his testimony that he wasn't wearing an orange jacket. The final factor in considering reasonable suspicion was the location of Mr. Mason compared to other potential suspects in the area. Mr. Mason was the closest in geographic proximity to the site of the reported burglary, and that was found by the lower court. Mr. Mason was approximately, the 76 station where he was found was approximately, was separated from the performance radiator by an alleyway that was approximately 12 to 15 feet wide. The lower court found that the location of the 76 station where Mr. Mason was encountered by Officer O'Brien and the performance radiator was close to or adjacent to the location of the site of the reported crime. So you have a description known by Officer O'Brien over the radio of a black male with facial hair wearing a jacket and brightly colored clothing, and that is exactly what Officer O'Brien, well, absent the orange colored sweatshirt, it's exactly what Officer O'Brien saw at the time that he was observing Mr. Mason, initially from a distance of approximately 40 feet, and then when he approached him at the 76 station. And I should mention throughout this encounter, going back to the issue of consent, the lower court found that Officer O'Brien was never closer to Mr. Mason than five feet before he patted him down for weapons. It's the position of the government that this encounter was indeed consensual, that the factual findings were not clearly erroneous, and that this court should affirm the ruling of the district court. And I see that I have more time left. I'm happy to answer further questions, or I'm willing to concede my time. No questions. Thank you. Thank you, Mr. Carter. Ms. Lottie, you have a short time left for rebuttal. On the issue of the seizure, the test is whether a reasonable person would feel free to leave. Would a reasonable person feel free to leave when two marked police cruisers descend upon you, parking their cars so that they are parked directly in front of you? The arresting officer testifies that as soon as he gets out of the car, when he's still ten feet away, he calls out to Mr. Mason, not asking him, can I ask you a few questions, but asking him, how long have you been at the store, and were you with those two guys in the back of the store, one of whom has already been arrested? The second thing that's asked of Mr. Mason is his identification. He gives it. He gives his full name and his birth date. A criminal history check is done, and even after that clears Mr. Mason, the officer continues to detain him because he suspects him of being a suspect in a burglary. That sounds like a Terry stop. He continues to detain him. He asks him for his Social Security number. He says he only asks him for the last four digits because most people cannot give a Social Security number without giving the entirety of the number. He asks him, when were you last arrested and what for? And then he asks him for his traffic violations because he assumes he's lying, and he says that he did so in that case because most people giving a false name would not remember their friend's traffic violations. Okay. The time is up. We're going to have to conclude the argument. U.S. v. Mason, that's submitted. And we thank Ms. Lai and Mr. Cornell. Kozol v. Payne is submitted on the briefs, and the Court will adjourn.
judges: Beezer, Gould, Callahan